# UNITED STATES DISTRICT COURT

for the
Western District of Washington

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| The TARGET DEVICES, more fully described in Attachments A and A-1 | ) ) ) | 

Case No. MJ23-568

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*
See Attachments A and A-1, incorporated herein by reference.

located in the _____ Western _____ District of _____ Washington _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. § 1324(a)(1)(A)(i) and Title 18 U.S.C. § 2; | Smuggling non-citizen into United States, or aiding and abetting the same Conspiracy to smuggle non-citizen into United States |
| 8 U.S.C. § 1324(a)(1)(A)(v) | |

The application is based on these facts:

✓ See Affidavit of Krystle Mendoza, continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

---

Pursuant to Fed. R. Crim. P. 4.1, this warrant is presented: ☑ by reliable electronic means; or: ☐ telephonically recorded.

KRYSTLE L MENDOZA
Digitally signed by KRYSTLE L MENDOZA
Date: 2023.11.27 11:32:47 -08'00'

*Applicant's signature*

Krystle Mendoza, Special Agent
*Printed name and title*

○ The foregoing affidavit was sworn to before me and signed in my presence, or
◉ The above-named agent provided a sworn statement attesting to the truth of the foregoing affidavit by telephone.

Date: _____ 11/28/2023 _____

*Judge's signature*

City and state: Seattle, Washington

Mary Alice Theiler, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT OF KRYSTLE MENDOZA

STATE OF WASHINGTON )
)        ss
COUNTY OF WHATCOM )

I, Krystle Mendoza, a Special Agent with Homeland Security Investigations, having been duly sworn, state as follows:

### INTRODUCTION AND IDENTIFICATION OF DEVICES

1.      I submit this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for search warrants authorizing the search and examination of the following digital devices[1] or other electronic storage media[2] (collectively referred to as the "**Target Devices**") which are further described in Attachments A and A-1, and which are currently in law enforcement possession, for the information described in Attachment B. The **Target Devices** include:

        a.      A silver iPhone 15 Pro cellular telephone in a clear case with black edging, bearing background images on rotation of children reported by IONUT MADALIN ZAMFIR to be images of his children (hereinafter referred to as "**Target Device 1**"), currently stored at the Blaine HSI Evidence Vault, located at 1380 Commerce Pl., Ferndale, WA 98248.

---

[1] "Digital device" includes any device capable of processing and/or storing data in electronic form, including, but not limited to: central processing units, laptop, desktop, notebook or tablet computers, computer servers, peripheral input/output devices such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media, related communications devices such as modems, routers and switches, and electronic/digital security devices, wireless communication devices such as mobile or cellular telephones and telephone paging devices, personal data assistants ("PDAs"), iPods/iPads, Blackberries, digital cameras, digital gaming devices, global positioning satellite devices (GPS), or portable media players.

[2] Electronic Storage media is any physical object upon which electronically stored information can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

b.      A black Samsung cellular telephone in a black GOTO case (hereinafter referred to as "**Target Device 2**"), currently stored at the Blaine HSI Evidence Vault, located at 1380 Commerce Pl., Ferndale, WA 98248.

2.      The warrant would authorize the forensic examination of the Target Devices, for the purpose of identifying electronically stored data particularly described in Attachment B.

## AFFIANT BACKGROUND

3.      I, Krystle Mendoza, am a Special Agent (SA) with the U.S. Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Assistant Special Agent in Charge (ASAC) Blaine, Washington, field office.  I have been employed as an HSI Special Agent since 2019.  I am currently assigned to the child exploitation / human trafficking unit in the HSI office in Ferndale, WA.  I am a law enforcement officer of the United States, who is empowered by law to conduct investigations of, and to make arrests for offenses enumerated in Title 18, United States Code.  Prior to this, I worked with the Canada Border Services Agency from 2003 to 2018.

4.      In my capacity as a Special Agent, my daily activities include the investigation of charges related to the smuggling of goods, people, and contraband into and out of the United States.  I also enforce federal criminal laws relating to the unlawful entry of individuals that have not presented themselves for inspection at a designated Port of Entry.  I am responsible for conducting investigations into the numerous federal laws enforced by HSI.

5.      I received training at the Federal Law Enforcement Training Center in Glynco, Georgia.  While there, I completed the Criminal Investigation Training Program and the HSI Special Agent Training Academy.  I have received training in interviewing techniques, arrest procedures, immigration law, search warrant applications, the execution of searches and seizures, and various other criminal laws and procedures.  I have been the affiant on numerous search and arrest warrants.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

6.      The facts set forth in this affidavit arise from my personal and direct participation in the investigation, my experience and training as an HSI Special Agent, my conversations with witnesses and other law enforcement personnel, including Border Patrol Agents within the Department of Homeland Security, and information gleaned from my review of reports and evidence related to this investigation. The discussion below includes only the information I believe necessary to establish probable cause that evidence, fruits and instrumentalities of violations of: smuggling of noncitizens into the United States, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(i) and Title 18, United States Code, Section 2; or conspiracy to smuggle noncitizens into the United States under Title 8, United States Code, Section 1324(a)(1)(A)(v), will be found on the **Target Devices**.  I do not purport to summarize all the evidence gathered during my investigation, nor does the discussion below include all facts known to me or others involved with this investigation.

## KNOWLEDGE BASED ON TRAINING AND EXPERIENCE

7.      Based on my training and experience, including my experience in numerous investigations and my discussions with other officers and agents, I am aware that it is common practice for human smugglers to work in concert with one another utilizing cellular telephones.  A common method utilized by human smugglers working at the U.S./Canadian border, particularly in the rural farming areas of Whatcom County, Washington, is to utilize a vehicle to drive over a shallow ditch that exists at much of the international border boundary line.  This method of transportation often requires coordination with other individuals via cellular telephones.  For instance, I am aware that smuggling coordinators in Canada frequently communicate and coordinate with the individuals responsible for smuggling persons or goods into the United States via cellular telephone.  These communications can occur before, during, and after the individuals arrive in the United States.  For example, prior to illegal importation, human smuggling

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

coordinators frequently communicate via phone calls, text messages, and other messaging applications with the transporter(s) regarding arrangements and preparation for the smuggling operation.  Human smugglers communicate with the individuals they are smuggling via phone calls, text messages, and other messaging applications to coordinate payment and logistics, such as where and when to pick the individuals up, how payment will be made and by whom, the mode of transportation the individual will be using to get to the pickup location, the location they are staying while awaiting being smuggled, who the individuals will be dropped off to and where, and to provide instructions.  In the case of an unaccompanied minor being smuggled, the smugglers may communicate directly with the parents or guardians of the child to coordinate all smuggling arrangements and payment, to request and send updates and check on the wellbeing of the child, and to communicate with other family members about the smuggling arrangements.  When the movement is underway, human smugglers frequently communicate via phone calls, text messages, and other messaging applications with the transporter(s) to remotely monitor the progress of the smuggling operation, provide instructions, and warn accomplices about law enforcement activity.  When the individuals have been smuggled into the United States, they may communicate with the transporter(s) via cellular telephone calls, text messages, and other messaging applications to provide updates, secure payment, coordinate drop-off, and receive further instructions regarding the drop-off of individuals within the United States.

8.      I know, based on my training and experience, that persons who are smuggled into the United States may be attempting to circumvent the United States criminal justice system.  While certainly not always the case, persons who are smuggled into the United States may sometimes have criminal or administrative charges against them which would prevent their lawful admission into the United States.  Again, while not always the case, persons who are smuggled may sometimes also be actively

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  participating in other criminal conspiracies with one another at the time of their

2  smuggling into the United States and are smuggled for the purpose of concealing those

3  ongoing schemes.

4      9.      The motivation for a human smuggler to bring a person across the

5  international border may vary.  Sometimes, the arrangement is a simple monetary

6  transaction.  Other times, a smuggler may be doing someone a personal favor, repaying a

7  personal debt, or may be actively trying to conceal involvement in other nefarious

8  activities, such as human trafficking.

9      10.     I know, based on my conversations with Border Patrol Agents and other

10  Homeland Security Investigations Special Agents, that undocumented non-citizens of

11  Romanian descent often make their first entry into the United States at the U.S./Mexico

12  border.  Border Patrol Agents on the U.S./Canada border often encounter Romanian

13  nationals who have already been documented as having entered the United States

14  illegally through Mexico.  It is also common that citizens of Romania refer to their close

15  friends as "cousins" or by other familial terms, though they may not actually be related

16  by blood.

17                          **SUMMARY OF PROBABLE CAUSE**

18      11.     On November 9, 2023, at approximately 13:44 hours Border Patrol Agent

19  Colin McLean was performing line watch duties along the United States and Canada

20  border, in and around the city limits of Blaine, Washington.  Line watch is a blanket term

21  used by agents when referring to their patrol duties.  Those duties include responding to

22  sensor activity, looking for signs of cross border entries, checking known crossing

23  locations and remaining highly visible to deter illegal entries.

24      12.     At this time, Blaine Sector Communications Center advised Blaine Border

25  Patrol Agents that Blaine Sector Dispatch, via Remote Video Surveillance system, had

26  observed a white Ford Expedition parked at the north end of Harvey Road in Blaine,

27

1  Washington.  This location is right across the United States/Canada International

2  Boundary.  The location is approximately 1 mile east of the Pacific Highway Port of

3  Entry.  The location is not a designated port of entry or otherwise designated by a United

4  States immigration official for border crossing.  As dispatch relayed what they observed,

5  a total of 12 people had emerged from the brush and were observed entering the white

6  Ford Expedition that was parked at the north end of Harvey Road in Blaine, Washington.

7  Based on my training and experience, I know that, in smuggling cases, it is common for

8  individuals to travel from Seattle to predesignated locations in order to pick up subjects

9  who want to illegally cross into the United States.  Based on my training and experience,

10  I know that, in this scenario, it is common for the subjects to be loaded into vehicle(s) to

11  be transported to Seattle or their final destination.

12      13.    In this case, all 12 subjects were observed loading into the white Ford

13  Expedition, and the vehicle then headed southbound on Harvey Road towards H street.

14  Agent McLean advised that he was enroute to the area.  As Agent McLean approached

15  the location, he was able to see the white Ford Expedition turning east onto H Street

16  Road and continuing south on Harvey Road, toward Pipeline Rd.  As Agent McLean

17  caught up with the white Ford Expedition, he activated his emergency lights to conduct a

18  vehicle stop.  The white Ford Expedition yielded to the emergency lights at the

19  intersection of Harvey Road and Sweet Road.  Agent McLean approached the driver's

20  side of the white Ford Expedition, identifying himself as a Border Patrol Agent.  Agent

21  McLean noticed there were many individuals in the vehicle and ordered the driver to exit

22  the vehicle with his hands up, in order to keep him from fleeing the scene.

23      14.    At this time, United States Customs and Border Protection (CBP) officers

24  from the Office of Field Operations arrived and helped secure the scene.  In addition, at

25  this time, Supervisory Border Patrol Agent (SBPA) Rodriguez and Border Patrol Agent

26  Pena arrived.  During questioning of the driver, now identified to be IONUT MADALIN

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  ZAMFIR, Agents McLean, Pena, and Rodriguez asked the driver if he had just picked up

2  passengers.  ZAMFIR admitted he had just picked up the passengers on Harvey Road.

3  Agent McLean conducted a search of ZAMFIR's shoulder bag and located his Missouri

4  Driver's License, as well as a Romanian passport, which ZAMFIR stated belonged to the

5  passenger in the front seat.  The Missouri driver's license identified the driver as IONUT

6  MADALIN ZAMFIR.  Agent McLean advised ZAMFIR that he was being detained for

7  immigration violations and was going to be taken back to the station for further

8  questioning.

9        15.    SBPA Rodriguez reported that he heard crying and screaming coming from

10  the white Ford Expedition and as SBPA Rodriguez approached the vehicle, he reported

11  that he saw the hatch back open, and children stacked on top of each other crying and

12  screaming for who appeared to be their parents sitting in the middle row of the SUV.

13  There were approximately three children in the back cargo area with no restraints.  SPBA

14  Rodriguez observed another child in the front passenger seat sitting on the center console

15  in the front of the vehicle.  SBPA Rodriguez counted a total of 13 individuals in the white

16  Ford Expedition, with the driver having already been previously removed from the

17  vehicle by BPA McClean.  With the inclusion of driver ZAMFIR, a total of 14 people

18  had been inside the white Ford Expedition.  SBPA Rodriguez overheard one of the

19  children speaking Spanish and began to communicate with the child in Spanish,

20  attempting to calm the child and their parents down.  SBPA Rodriguez identified himself

21  as Supervisory Border Patrol Agent Rodriguez and asked the adults to state their

22  citizenship in which they responded "Romania."  Several other individuals were observed

23  by SBPA Rodriguez and BPA Pena to include I.A, D.A, I.G, A.A, M.A, A.B, M.P, M.G,

24  A.Z, I.P, F.Z, and A.P.  All 14 subjects were transported to the Blaine Border Patrol

25  Station and processed through immigration.

26

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

16.     The passenger in the front seat of the vehicle was identified as DANIEL ANDRONACHE, based on his Romanian Passport that was located in ZAMFIR's shoulder bag.  It was discovered that both ZAMFIR and ANDRONACHE were stopped by Sumas Border Patrol Agent's (BPA) earlier in the day for suspicious activities in the Sumas area of responsibility, based on a report involving the same white Ford Expedition with the same license plate.  During this earlier incident, both subjects were released by Sumas BPA after further field interviews could not determine their activities.

17.     On November 9, 2023, at approximately 7:03 p.m. an audio and video-recorded statement was taken from IONUT MADALIN ZAMFIR at the Blaine Border Patrol Station by myself and BPA-Intel Manuel Robles.  Before the statement was taken, I read ZAMFIR his Miranda Rights.  I conducted the interview in English, as ZAMFIR spoke English and stated his preference to have the interview conducted in English. ZAMFIR voluntarily waived his Miranda rights and agreed to speak to law enforcement.

18.     ZAMFIR stated he is a Romanian citizen.  ZAMFIR stated that he arrived in the United States three years ago, crossing the border illegally into the United States from Canada via automobile.  ZAMFIR stated that he currently resides with his family in Omaha, Nebraska.  ZAMFIR stated that he is currently in possession of a valid Employment Authorization Document (EAD).  ZAMFIR admitted to being the driver of the vehicle that picked up the 12 individuals crossing the border illegally from Canada into the United States and stated that his 12 family members had flown to Toronto and had rented a vehicle to drive to the area where they had crossed the border illegally.

19.     ZAMFIR stated that he flew from Omaha, Nebraska to Seattle, Washington on November 8, 2023, with his cousin, DANIEL ANDRONACHE.  ZAMFIR stated that he and his cousin DANIEL ANDRONACHE had flown in together, and that he had paid for their plane tickets.  ZAMFIR said they spent the night at a hotel in Seattle before driving to pick up their 12 family members in Canada.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

20.     Based on a review of ZAMFIR's and ANDRONACHE's plane tickets, it has been determined that ZAMFIR and ANDRONACHE actually flew into Seattle from Nebraska on November 7, 2023.

21.     ZAMFIR stated that on the morning of November 9, 2023, he rented the white Ford Expedition that he used to pick up his 12 family members.  ZAMFIR also stated that earlier in the day, he and DANIEL ANDRONACHE were stopped by Border Patrol Agents near Sumas/Lynden, while they were driving around site seeing.  ZAMFIR stated that DANIEL ANDRONACHE had to use the bathroom and got out to urinate. ZAMFIR stated that, while in the area, they gambled at the Nooksack Northwood Casino for about 45 minutes.  ZAMFIR stated that he had a telephone conversation with the family members, while they were waiting in Canada.  The family members stated that they were waiting at a different area of the border.  ZAMFIR stated that after that conversation, he and DANIEL ANDRONACHE drove to Harvey Rd., and ZAMFIR stated that the family members crossed the border from Canada and got into the white Ford Expedition that ZAMFIR was driving.  ZAMFIR stated that he picked up all 12 individuals that were in the vehicle when BPA McLean conducted the traffic stop. ZAMFIR stated that he knew that the vehicle he was operating was designed to hold only 8 passengers.  ZAMFIR stated that they left the area but were stopped by Border Patrol Agents.  ZAMFIR stated that he and his cousin, ANDRONACHE, had planned to pick up his family members and drive 15-20 minutes and then switch to another rental vehicle. From there, they had planned to continue driving to Seattle, Washington.  ZAMFIR claimed that they did not have a standing appointment for another rental vehicle, but they were just going to walk in somewhere.  ZAMFIR stated that he is aware that the 12 passengers he picked up had entered into the United States illegally.

22.     ZAMFIR stated that he had two phones with him, an iPhone 15 and a Samsung, which have now been identified as the **Target Devices**.  ZAMFIR further

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  explained that his phones could be distinguished by viewing the screensaver pictures on

2  the front screen.  ZAMFIR stated that pictures of his children would be visible,

3  specifically ones of his daughter in a blue robe.  ZAMFIR stated that he owned both the

4  iPhone 15 and the Samsung, however the Samsung did not have a sim card in it and that

5  he solely used it for Wi-Fi.  ZAMFIR explained that his iPhone 15 was probably dead

6  and that he had owned this phone for approximately 1 month.  The **Target Devices** were

7  also located on ZAMFIR's person, and matched the description given by ZAMFIR.

8      23.      At 7:25 p.m., ZAMFIR was asked for consent to search his cellular phones,

9  however ZAMFIR declined consent to search these devices. ZAMFIR's phones were

10  seized by law enforcement and are currently located at the Blaine HSI Evidence Vault,

11  located at 1380 Commerce Pl., Ferndale, WA 98248.

12      24.      On November 9, 2023, at approximately 7:45 p.m. an audio and video-

13  recorded statement was taken from DANIEL ANDRONACHE at the Blaine Border

14  Patrol Station by myself and BPA-Intel Manuel Robles.  Before the sworn statement was

15  taken, BPA-Intel Robles read ANDRONACHE his Miranda Rights.  The interview was

16  conducted in Spanish by BPA-Intel Manuel Robles.  ANDRONACHE voluntarily

17  waived his Miranda rights and agreed to speak to law enforcement. ANDRONACHE

18  voluntarily signed ICE form 73-025, and myself and BPA-Intel Robles witnessed the

19  signature. ANDRONACHE made the following statements:

20      25.      ANDRONACHE confirmed his full and correct name as DANIEL

21  ANDRONACHE.  ANDRONACHE stated he is a citizen of Romania.  ANDRONACHE

22  stated that, 18 months ago, he had crossed into the United States illegally around

23  Tijuana/Baja with his wife, daughter, and son.  They were apprehended by United States

24  Border Patrol.  ANDRONACHE has a pending immigration court date based on this

25  incident.  ANDRONACHE stated he currently resides in Omaha, Nebraska.

26  ANDRONACHE stated he works in construction and gets paid in cash for his work.

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

ANDRONACHE stated he has a pending immigration asylum appointment on January 15, 2025.  ANDRONACHE admitted he was the front-seat passenger of the white Ford Expedition that picked up the 12 individuals crossing the border illegally from Canada. ANDRONACHE stated that all of the occupants in the vehicle were his family members. ANDRONACHE stated that the 12 family members he picked up from the border drove from Toronto, Canada in a vehicle to the area where they had crossed the border illegally.

26.  ANDRONACHE stated he had arrived in Washington two days ago, on November 7, 2023.  ANDRONACHE stated he flew from Nebraska to Seattle, Washington and stayed in a hotel room for two nights.  ANDRONACHE stated he flew with his cousin, IONUT MADALIN ZAMFIR, on the same flight from Nebraska. ANDRONACHE stated they came to border yesterday in an Uber.  ANDRONACHE stated the Uber took them to the Northwood Casino in Lynden, Washington since their family members were going to attempt to make an illegal entry into the United States using the vehicle they drove in from Toronto, Canada to Vancouver, British Columbia. ANDRONACHE stated that his family claimed they could not make entry into the United States as there were too many Border Patrol agents along the border.  ANDRONACHE stated that, at that time, ANDRONACHE and ZAMFIR took another Uber back to Seattle for the night.  ANDRONACHE stated that they had rented the white Ford Expedition on November 9 from Seattle.  ANDRONACHE stated his cousin, IONUT MADALIN ZAMFIR, was the one who rented and paid for the car since he has the driver's license and credit card to be able to do that.  ANDRONACHE then stated they both drove to the border to pick up his family members.  ANDRONACHE stated that himself and ZAMFIR went to the casino area once again since they knew that area and hung around there until his family members could cross into the United States.  ANDRONACHE stated he had to go pee and got off near the border to relieve himself.  Border Patrol noticed him and pulled him and ZAMFIR over and asked them what they were doing in

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

the area.  ANDRONACHE told agents he had to use the restroom and got off in the area to relieve himself.  Agents conducted their records checks and released them after they were done.

27.     ANDRONACHE stated his brother, I.A, who was in Canada, called and told him they were in another area away from their last location and asked him to move towards their location.  ANDRONACHE and ZAMFIR drove towards Harvey Rd located near Blaine, Washington where they waited for a few minutes for the family to cross into the United States.  Once in the United States, ANDRONACHE stated all 12 family members got into the white Ford Expedition and drove away from the area.  ANDRONACHE stated they did not drive too far before being pulled over by Border Patrol.  BPA-I Robles asked ANDRONACHE why his family crossed through Canada and not through Mexico like him.  ANDRONACHE stated they crossed through Canada since they did not have the money to fly down to Mexico and cross there.

28.     ANDRONACHE was then asked if anyone within the group paid him for coming to pick them up and driving them to Seattle, Washington.  ANDRONACHE stated he did not charge any of them since they are all family. ANDRONACHE was then asked about the $3,100 USD that he had in his possession, and which was identified by law enforcement during processing.  ANDRONACHE stated he earned the money from working construction and that he always carries cash since he cannot open a bank account due to not having any legal papers to do so.

29.     On November 11, 2023, ZAMIFR and ANDRONACHE were charged by complaint with smuggling noncitizens into the United States at a place other than a port of entry, in violation of Title 8 U.S.C. Section 1324(a)(1)(A)(i).  On November 15, 2023, the grand jury charged ZAMFIR and ANDRONACHE with 12 counts of smuggling noncitizens into the United States at a place other than a port of entry, in violation of Title 8 U.S.C. Section 1324(a)(1)(A)(i).

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## **TECHNICAL TERMS**

30.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.     Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.     Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called "apps," which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  Pager: A pager is a handheld wireless electronic device used to contact an individual through an alert, or a numeric or text message sent over a telecommunications network. Some pagers enable the user to send, as well as receive, text messages.

h.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every device attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that device may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses.

i.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet,

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31.     Based on my training, experience, and research, and from utilizing iPhone and Samsung devices myself, I know that the **Target Devices** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  I also know that these devices can access the internet from a wireless network connection, and that through the internet the user can access social media accounts, email accounts, bank accounts, third-party messaging applications, and conduct internet searches.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## COMPUTERS, ELECTRONIC STORAGE, AND FORENSIC ANALYSIS

32.     Based on my knowledge, training, and experience, I know that digital devices and electronic storage media can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device used to access the Internet.  This information can sometimes be recovered with forensic tools.

33.     Based on information collected, including my conversations with other law enforcement agencies, I believe the **Target Devices** are likely to contain evidence of criminal activity.

34.     *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Devices** were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Target Devices** because:

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner and/or others with direct physical access to the computer. Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.[3] Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such

---

[3] For example, if the examination of a computer shows that: a) at 11:00am, someone using the computer used an internet browser to log into a bank account in the name of John Doe; b) at 11:02am the internet browser was used to download child pornography; and c) at 11:05 am the internet browser was used to log into a social media account in the name of John Doe, an investigator may reasonably draw an inference that John Doe downloaded child pornography.

image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.   A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35.   *Manner of execution.* Because this warrant seeks only permission to search the **Target Devices** already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

## DIGITAL DEVICES AS INSTRUMENTALITIES OF THE CRIMES

36.     Title 8 U.S.C. § 1324 prohibits intentionally bringing an alien into the United States at a place other than a port of entry or place other than as designated by the Commissioner, knowing that person is an alien.  Based on my training and experience, I know that an individual that illegally transports aliens into the United States may communicate via telephone with the persons being smuggled, and those communications may show the relationship between the smuggled person and the smuggler, such as if they know one another intimately, or knew the person when they lived in their home county.  The communications may further show the motive of the smuggler, such as whether the smuggler acted for a financial benefit or for a personal benefit.  A smuggler may also communicate via telephone with a person supplying the means of transport—for instance, the smuggler may rent a vehicle with capacity to transport multiple people and will communicate to discuss whether the vehicle is capable of driving on the terrain at the border crossing.  The telephone communications electronically stored on a phone may also show instructions given by the smuggler to the smuggled people which would aid in evading law enforcement, such as what statements to make or how to behave in the case of a law enforcement encounter.  In summary, based on my training and experience, the data maintained in a cellular telephone used by a human smuggler can contain evidence of a crime or crimes, including the following:

a.      The assigned number to the cellular telephone (known as the mobile directory number or MDN), and the identifying telephone serial number (Electronic Serial Number, or ESN), (Mobile Identification Number, or MIN), (International Mobile Subscriber Identity, or IMSI), or (International Mobile Equipment Identity, or IMEI) are important evidence because they reveal the service provider, allow us to obtain subscriber information, and uniquely identify the telephone.  This information can be used to obtain toll records, to identify contacts by this telephone with other cellular telephones used by co-conspirators, to identify other telephones used by the same subscriber or purchased as part of a package.

b.      The stored list of recent received, missed, and sent calls is important evidence.  It identifies telephones recently in contact with the telephone user.  This is

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

valuable information in a smuggling investigation because it will identify telephones used by other members of the conspiracy or the persons that are being smuggled. Further, the information is helpful (and thus is evidence) because it leads to friends and associates of the user who can identify the user, help locate the user, and provide information about the user.

c.      Stored text messages are important evidence, similar to stored numbers. Agents can identify evidence of the smuggling activity, as well as friends of the user who likely have helpful information about the user, his location, and his activities.

d.      Photographs and videos on a cellular telephone are evidence because they help identify the user, either through his or her own picture, or through pictures of friends, family, and associates that can identify the user. Also, digital photos often have embedded "geocode" or GPS information embedded in them. Geocode information is typically the longitude and latitude where the photo was taken. Showing where the photo was taken can have evidentiary value. This location information is helpful because, for example, it can show where coconspirators meet, where they travel, and where assets might be located.

e.      Stored address records are important evidence because they show the user's close associates and family members, and they contain names and nicknames connected to phone numbers that can be used to identify suspects.

37.      Based upon the evidence provided, it is reasonable to believe that the **Target Devices** were utilized to facilitate the crime of bringing aliens into the United States at a place other than a designated port of entry, in violation of 8 U.S.C. § 1324(a)(1)(A)(i), or the commission of a conspiracy to commit the same, in violation of 8 U.S.C. § 1324(a)(1)(A)(v).

## **SEARCH TECHNIQUES**

38.      Based on the foregoing, and consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, the warrant I am applying for will permit imaging or otherwise copying all data contained on the **Target Devices**, and will specifically authorize a review of the media or information consistent with the warrant.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

39.     In accordance with the information in this affidavit, law enforcement personnel will execute the search of the **Target Devices** pursuant to this warrant as follows:

### a.  Securing the Data

i.  In order to examine the ESI in a forensically sound manner, law enforcement personnel with appropriate expertise will attempt to produce a complete forensic image, if possible and appropriate, of the **Target Devices**.[4]

ii. Law enforcement will only create an image of data physically present on or within the **Target Devices**.  Creating an image of the **Target Devices** will not result in access to any data physically located elsewhere.  However, **Target Devices** that have previously connected to devices at other locations may contain data from those other locations.

### b.  Searching the Forensic Images

Searching the forensic images for the items described in Attachment B may require a range of data analysis techniques.  In some cases, it is possible for agents and analysts to conduct carefully targeted searches that can locate evidence without requiring a time-consuming manual search through unrelated materials that may be commingled with criminal evidence.  In other cases, however, such techniques may not yield the evidence described in the warrant, and law enforcement may need to conduct more extensive searches to locate evidence that falls within the scope of the warrant.  The

---

[4] The purpose of using specially trained computer forensic examiners to conduct the imaging of digital devices or other electronic storage media is to ensure the integrity of the evidence and to follow proper, forensically sound, scientific procedures.  When the investigative agent is a trained computer forensic examiner, it is not always necessary to separate these duties. Computer forensic examiners often work closely with investigative personnel to assist investigators in their search for digital evidence.  Computer forensic examiners are needed because they generally have technological expertise that investigative agents do not possess. Computer forensic examiners, however, often lack the factual and investigative expertise that an investigative agent may possess on any given case.  Therefore, it is often important that computer forensic examiners and investigative personnel work closely together.

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  search techniques that will be used will be only those methodologies, techniques and

2  protocols as may reasonably be expected to find, identify, segregate and/or duplicate the

3  items authorized to be seized pursuant to Attachment B to this affidavit.

4  **CONCLUSION**

5      50.    I submit that this affidavit supports probable cause for a search warrant

6  authorizing the examination of the **Target Devices** described in Attachments A and A-1,

7  to seek the items described in Attachment B.

8      51.    The affidavit and application are being presented by reliable electronic

9  means pursuant to Federal Rules of Criminal Procedure 4.1 and 41(d)(3).

10
11  KRYSTLE L MENDOZA
Digitally signed by KRYSTLE L MENDOZA
Date: 2023.11.27 11:30:41 -08'00'

12
13  KRYSTLE MENDOZA, Complainant
Homeland Security Investigations
Special Agent

14

15      The above-named agent provided a sworn statement to the truth of the foregoing

16  affidavit by telephone on this 28th day of November, 2023.

17

18

19  _____
MARY ALICE THEILER

20  United States Magistrate Judge

21

22

23

24

25

26

27

AFFIDAVIT OF SPECIAL AGENT MENDOZA
USAO#2023R01232- 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

# ATTACHMENT A

The property to be searched is:

A silver iPhone 15 Pro cellular telephone in a clear case with black edging, bearing background images on rotation of children reported by Ionut ZAMFIR to be images of his children (hereinafter referred to as "**Target Device 1**"), currently stored at the Blaine HSI Evidence Vault, located at 1380 Commerce Pl., Ferndale, WA 98248.

This warrant authorizes the forensic examination of **Target Device 1** for the purpose of identifying the electronically stored information described in Attachment B.

 

 

ATTACHMENT A
USAO# 2023R01009 - 1

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101
(206) 553-7970

**ATTACHMENT A-1**

The property to be searched is:

b.      A black Samsung cellular telephone in a black GOTO case (hereinafter referred to as "**Target Device 2**"), currently stored at the Blaine HSI Evidence Vault, located at 1380 Commerce Pl., Ferndale, WA 98248.

This warrant authorizes the forensic examination of **Target Device 2** for the purpose of identifying the electronically stored information described in Attachment B.





ATTACHMENT A
USAO# 2023R01009 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**ATTACHMENT B**

All records on the **Target Devices** described in Attachments A and A-1 that relate to the illegal transport of non-citizens into the United States, or a conspiracy to commit the same, in violation of Title 8 U.S.C. § 1324, occurring from a date unknown up to and including November 9, 2023 including:

a. Assigned number and identifying telephone serial number (ESN, MIN, IMSI, or IMEI);

b. Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

c. Records of the Internet Protocol addresses used;

d. Records of Internet activity relating to the crimes of investigation, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

e. Stored list of recent received, sent, or missed calls;

f. Stored contact information;

g. Photographs and video related to the crimes of investigation, including any embedded GPS data associated with these photographs;

h. Photographs and video that may show the user of the phone and/or co-conspirators, including any embedded GPS data associated with these photographs;

i. Stored text messages, chats, chat logs, and audio files related to the crimes of investigation including Apple iMessages, WhatsApp messages, Facebook Messenger, Blackberry Messenger messages or other similar messaging services where the data is stored on the telephone;

ATTACHMENT B
USAO# 2023R01009 - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

j.   Records of location and GPS data;

k.   Evidence of financial arrangements, including fees and expenses, paid to illegally transport, or aid and abet the illegal transport, of individuals into the United States, including evidence of bank records, checks, credit card bills, currency, account information, and other financial records that exist on the **Target Devices**;

l.   Evidence identifying the occupants of the vehicle that were illegally transported into the United States, including their alienage, their relationships to one another, and their prior or upcoming travel plans;

m.   Evidence of the accounts, facilities, storage devices, and/or services (such as email addresses, IP addresses, WhatsApp accounts, Facebook Messenger accounts, and phone numbers) used to facilitate the illegal transport of individuals into the United States;

n.   Evidence relating to the identity of co-conspirators, criminal associates, or others involved in the illegal transport of non-citizens into the United States;

o.   Evidence of the travel to, or presence at, locations involved in the illegal transport of non-citizens into the United States, such as stash houses, load houses, the international borderline, or delivery points;

p.   Evidence relating to the identity, alienage, travel plans, and motives of any other non-citizen that was illegally transported into the United States;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

ATTACHMENT B
USAO# 2023R01009 - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970